# Freck *versus* The Locust Mountain Coal and Iron Company.

1. Where a party is the lessor of two adjoining mines, the rule governing adjacent mines when held by different owners, that the lessee must ascertain the dividing line at his peril, does not apply for the lessor having the power to protect himself by covenant, if he neglects to do so, he cannot plead rules resulting *ex necessitate rei* as against his own grant.

2. Where the lessor not only gives his tenant the power, but makes it his duty to explore and mark a theoretical line upon his own premises, the tenant cannot be treated as a trespasser if, in an honest attempt to ascertain the line, he should chance to pass over it; for the right to do what is necessary in order to find and fix the line, is implied in the grant by which it is made a boundary, and in such a case the lessor can only recover damages for improper mining or criminal negligence.

February 19th and 20th 1878. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and TRUNKEY, JJ. WOODWARD, J., absent.

Error to the Court of Common Pleas, No. 2, of *Philadelphia county*: Of January Term 1876, No. 147.

Action on the case, by the Locust Mountain Coal Company, against Joseph M. Freck.

Plaintiff owned two adjoining coal tracts, in Columbia county, called respectively Centralia and Hazeldell. The first it leased, in 1862, to defendant, for a term of ten years, and the other to Robert Gorrell & Co. The defendant in his lease was given the right "to dig, mine and take away coal, as their own property, from the veins of coal above and below the water level, as hereinafter limited and described, viz.: All the coal in the south dipping vein, known as the Mammoth vein, in the Centralia or Centreville basin, in the county of Columbia and state aforesaid, beginning at

[Freck v. Locust Mountain Coal and Iron Co.]

the east line of the lands of the party of the first part, and following the vein westward one mile and one-third of a mile; also all the coal in all other south dipping veins, in said Centralia basin, within the limits of the run hereinbefore named, which the parties of the second part shall cut by tunnel, and work on or before the 1st day of January 1866." For this privilege, Freck was to pay plaintiff a royalty of twenty-five cents per ton. Gorrell & Co. had a similar lease of all the coal in the "north dipping vein," the royalty reserved being thirty-five cents per ton.

The veins form what is called a basin, oblong in shape, many miles in length, the north and south sides sloping to the bottom, something like the letter V, and drawing together at the eastern and western ends of the basin, in a formation something like the end of the bowl of a spoon. The coal lies between thick seams or layers of slate, like the leaves of a book between the covers of it. The covers represent the slate. That part of the vein, or side of the basin which inclines or dips to the north, is called the "north dip," and the other side of the basin, or part of the vein which inclines to the south, is called the "south dip." The lowest point, where the two dips meet, is called the synclinal axis.

The controversy in this case arises from the interference of the mines worked, on the north and south dips of the Mammoth vein, near the synclinal axis.

This axis formed the boundary line between the respective tracts leased by Gorrell and defendant, and this action was brought for damages resulting from the trespasses of Freck, who, it was alleged, had crossed this line with his gangway during the course of his mining. It was shown that Freck had crossed this axis, his gangway being lower than that of Gorrell, and the water from the mine of the latter flowed into the Centralia, and that, by reason thereof, the plaintiff was compelled to incur large additional expense for machinery and pumping. It was also in evidence that Freck had mined seven thousand tons of coal out of Hazeldell, upon which the additional royalty of ten cents per ton was claimed, and for which, it seemed, he paid. There was considerable evidence, on the part of defendant, to show the difficulty of ascertaining the true location of the synclinal axis until it had been reached by working the mines; and plans were offered in evidence showing that the plaintiff's own engineers were not positive as to its true location. He also gave evidence to show that the damages complained of could have been avoided, if Gorrell had raised the grade of his gangway, or carried off the water by means of troughs. By the terms of the lease, the plaintiff reserved full power to supervise the work, under the inspection of its own engineers, and in pursuance thereof, its engineer, Mr. Stockett, had, at various times, entered and inspected the operations of Freck, and on the 22d of April 1871, sent him the following notice:—

[Freck *v.* Locust Mountain Coal and Iron Co.]

" Office Locust Mountain Coal & Iron Co.,
Centralia, April 21st 1871.

Gentlemen :

A part of the breasts turned on the south side of your east gangway of 2d lift on the Mammoth Vein, is beyond the limits of your lease, and consequently within the limits of another lease. The object of this notice is to prevent any infringement on the rights granted to the lessees.

Yours respectfully,

THOMAS R. STOCKETT, Eng. and Agt.

Messrs. J. M. Freck & Co.,
Lessees of Centralia Colliery."

On the same day Mr. Stockett wrote to the president of the Locust Mountain Company, detailing a conversation he had had with Freck and his mining-boss, Williams, wherein they had expressed their confidence that there was yet another south dip between the breasts referred to and the adjoining lease of Gorrell & Co., and stating his own opinion that whilst this was possible, it was not probable. It did not appear that there was any remonstrance or caution against Freck proceeding with any experiment to discover this other " south dip." The junction of the two mines was first made by Gorrell & Co. after Freck had passed the boundary line. At this time the gangway of Gorrell & Co. was lower than that of Freck, yet, instead of making the grades conform, they drove it still lower.

At the trial, the plaintiff having proved that Gorrell, in driving his gangway in the Hazeldell colliery broke into the breast of the Centralia, and that the interference of the gangways produced a necessary peril, the counsel of defendant, on cross-examination of a witness, who was a mining engineer, produced by the plaintiff, asked him,

. " You say that this interference produced a necessary peril. At the time Gorrell, with his gangway, broke into breast 9, could not that difficulty have been avoided by a fair elevation of his gangway, so as to have avoided the gangway of Mr. Freck ?"

The plaintiffs objected to the question, because there was no duty on Gorrell to change his course of mining, and no control over him by the plaintiffs. The court sustained the objection.

The defendant, on the cross-examination of a mining engineer and a witness on the part of the plaintiff, who had testified to the location of the gangway driven by the defendant, proposed to ask him : " State, when the gangway struck the rise or pitch, where it turned or deviated first towards the south in following the bottom slate, whether they did not pursue the best and most approved methods of determining the synclinal axis by the course of the gangway itself ?"

[Freck *v.* Locust Mountain Coal and Iron Co.]

The court also sustained the objection to this question. The following points were presented by plaintiff, all of which the court affirmed:—

2. By the lease from the company to Gorrell, no right whatever was reserved to prevent Gorrell turning the water of the Hazeldell into Centralia, and the only right they had in that respect was precisely what they would have if they had not been Gorrell's landlord.

5. If the defendant extended his workings beyond the boundary line fixed by the lease, and thereby the colliery leased to him became connected with the adjoining colliery, the defendant is liable for any damage the owners of the colliery necessarily suffered in consequence.

6. If the Centralia colliery, by means of the connection thus formed, became liable to the flow of water from Hazeldell, and the risk of that liability diminished the renting value of Centralia, and the lessors sustained a loss, the defendant is liable for the amount of the loss thereby suffered by the landlord.

The following points were submitted by defendant, to which are subjoined the answers of the court:—

1. That it appears, by the lease from plaintiffs to defendant, that the south dipping veins were leased to defendant, and by the lease from plaintiffs to Gorrell, that the north dipping veins were leased by plaintiffs to Gorrell, and it is a conceded fact that these veins meet and intersect at the bottom of the basin; that if the jury believe that plaintiffs thus, by their own act, provided for and authorized the interference and intersection of the two workings, and the consequent opening of communication between the two mines, and that the workings of Gorrell, closely approaching the bottom of the basin, would, in a very short time, have produced such connection of the two mines, plaintiffs cannot recover for the consequences of such connection.

Ans. "I affirm that point, so far as it applies to the state of facts which have been proved before you. It undoubtedly is a supposable case, that if the defendant had mined the south dipping vein down to and along the axis, which he had a right to do, and if Gorrell had mined the north dipping vein down to and along the axis, which he had a right to do, there would have been, along the entire course of that axis, if it was opened at all, a joint gangway or opening of these two mines. That would have been a perfectly legal act, I think, of both the defendant and Mr. Gorrell; and for any injury that might have resulted from such an opening as that the plaintiff would have no remedy against Freck. But if you are of opinion that the opening which was made was a different kind of opening from that, and produced different consequences, if it was an opening caused by the trespass of Mr. Freck beyond his own boundary, then the applicability of that point does not arise, and you should consider the case independent of that."

5 Norris—21

2. That if the jury believe the best scientific, as well as the best practical methods known to the art of mining were employed by defendant, in working the south dipping veins, as he approached and arrived at the bottom of the basin, and that such scientific and practical methods, faithfully employed, would not have enabled defendant to make any more accurate ascertainment of the true position of the synclinal axis than he did through his workings, then there can be no recovery by plaintiff.

3. That the lease is to be interpreted in the light of the best methods known to the science of mining, and that both parties to it are to be understood as having these in view when they contracted, and that if the veins were mined only in the methods and to the extent which such scientific methods prescribe, there can be no recovery by plaintiff.

Ans. " Neither of these points are accurate statements of the law. They are the theory which the defendant's counsel has argued to you, but they are not the theory which I think governs this case.

" When a person approaches a point in which his rights come to be in doubt, and it is a matter of difficulty and danger to ascertain whether he is exactly right or not, it is his duty to stop short or to go on at his own risk. If he does go on, not having any certain light, he is responsible for the consequences.

" That the precise location of the synclinal axis is purely a question of fact, and exclusively for the determination of the jury, and that if the jury believe defendant did not transgress that line, as located by the jury, there can be no recovery by the plaintiff."

In the general charge, the court, Mitchell, J., also said:—

" This lease gave as a boundary of the premises leased to the defendant, on the south side (and that is the only side with which we are concerned in this controversy), what is called the bottom of the basin, or, more technically, and perhaps more accurately, by some witnesses, the synclinal axis.

" This axis, of course, you will understand, is an imaginary line, but it is the line where the north and the south dips come together, wherever that may be. This line, theoretically, is as fixed and definite as any boundary line can be; but, practically, it is a matter of very considerable doubt and difficulty to locate it exactly upon the land. Especially is this the case in the early part of the workings of a mine, before the bottom of the basin, or what may be called the debatable ground, through which this axis runs, has been laid open to admit of accurate measurement by scientific means. [Now, the difficulty in knowing where the correct line is, which forms the boundary of the defendant's lease in this case, does not in any way affect the rights of the parties.] It is not your business, as members of the jury, nor is it mine, to make contracts

[Freck v. Locust Mountain Coal and Iron Co.]

for other people, or to say that they ought to have made their contracts different, in order to avoid disputes. That was their own business. The parties in this case have made their contract, and your duty and mine is to see that each performs his proper duties, and obtains his proper rights under the contract which they have made.

["The synclinal axis, therefore, was the boundary which defined the defendant's rights in this case, and working across that boundary, whether it was easy or difficult to ascertain, whether it was done intentionally or in ignorance, was a trespass for which the defendant is liable, if any damage has thereby occurred to the plaintiffs."]

The verdict was for the plaintiff for $17,000. The defendant assigned for error the rulings of the court on the foregoing offers of testimony, the answers to points and the portions of the charge in brackets.

*F. W. Hughes* and *E. O. Parry*, for plaintiff in error.—The grant to Freck to take out coal at a certain per cent. per ton, was not a lease, but a mere license to mine : Bainbridge on Mines 117 ; Act of April 11th 1848, Pamph. L. 533, Purd. Dig., title "Land Office," pl. 120, 122 ; Brandt v. McKeever, 18 P. F. Smith 70 ; Johnstown Iron Co. v. Cambria Iron Co., 8 Casey 241 ; Funk v. Haldeman, 3 P. F. Smith 229. In granting the right to mine the coal from the south dip, the plaintiff granted to defendant the right to make use of so much of the land in which the vein was situated, whether on the surface, or under the surface of the ground, as was necessary for mining of the coal from the south dip in the usual, proper, efficient and workmanlike manner of mining.

A way to the coal was necessary for the enjoyment of the grant : 3 Cruise Dig., tit. xxiv., "Ways," sect. 1, pl. 11 ; Clarke v. Cogg, Cro. Jac. 170. The gangway was a way of necessity, made on the land of the grantor by the grantee, for the purpose of mining the coal from the south dip of the Mammoth vein. It was driven as near to the south dip of the vein as the formation of the ground would permit, and without any objection on the part of the plaintiff. It is not denied that it was made in good faith and in accordance with rules of good mining, and that when it was driven there were no indications that would show to a person skilful and experienced in the art of mining, that it could have been driven on any other line for the mining of the coal from the south dip, beyond the rising in the bottom slate, in an efficient and workmanlike manner.

The plaintiffs knew the position of the gangway, as it was made, and as they did not object to its location, they must be presumed, under the covenants of the lease, to have approved of it.

Gorrell & Co. could have prevented the flooding of the mines by changing the grade of their gangway, and this change it was their

[Freck *v.* Locust Mountain Coal and Iron Co.]

duty to make : Locust Mountain Coal and Iron Co. *v.* Gorrell, 29 Leg. Int. 101 ; Appeal of the Mammoth Vein Coal Co., 4 P. F. Smith 189 ; Clegg *v.* Dearden, 64 E. C. L. R. 576.

*A. Sidney Biddle* and *R. C. McMurtrie*, for defendant in error.—The grant was a lease and not a license, for rent, and the right of entry was reserved. The working over was not of necessity, either in the legal or in the miner's sense.

The grant was the right to take coal from a certain vein within certain limits. There was access to the vein within the lines. It is plain that all the coal could be got out by this access. It may be that it would be very expensive, too much so to make it profitable to do so. To say that this authorizes the use of any portion of the adjoining land, which will enable the lessee to mine all the coal to a profit, is certainly new doctrine. Ways of necessity are most rigorously construed. To extend the rule as here claimed, would be ruinous ; the rule is, if there is a way, however inconvenient, none passes by implication. Good intentions are not an excuse for over-working, and will not excuse a wrongdoer. There is no difference between a trespass on the landlord's property not granted and that of a stranger. The trespass was on Gorrell, the tenant, and not on the landlord. The only power reserved by the landlord was to secure the covenant to mine properly, not whether the tenant was confining his operations to the limits of his grant. The acceptance of royalty professedly paid for coal lawfully taken under the contract, cannot justify the wrongful act and estop the landlord. It was neither paid nor accepted in satisfaction of the injuries of which complaint is made. The landlord could not have compelled Gorrell to adopt another mode of working. They had no power to compel him to forego anything for the benefit of another colliery belonging to them. Gorrell might have avoided the difficulty had he known of the peril, and if he chose to abandon a part of his coal by raising his gangway. He was not bound to adopt such a course. His was not the wrongful act. The contention that Freck having gone to the bottom first, Gorrell was bound to change his course, is not tenable. There is no such obligation resting on an adjoining tenant.

Mr. Justice GORDON delivered the opinion of the court, May 6th 1878.

The principles, as well as the main facts of this case, are few and simple. The whole body of coal mentioned in the leases with Freck & Blackiston, and with Gorrell & Co., the former dated August 18th 1862, the latter January 11th 1868, belonged to the Locust Mountain Coal and Iron Company. The general vein or stratum, thus leased, lay in the Centralia or Centreville basin, and a cross section of it, in shape, resembles very much the letter V,

[Freck *v.* Locust Mountain Coal and Iron Co.]

except that the vein is rounded at the bottom. The northern part, called the "south dip," was that leased to Freck & Blackiston; the southern side, or "north dip," to Gorrell & Co. It follows, that the line, dividing these two leases, was the middle line of this basin, or that from which the two sides begin to ascend, called, technically, the synclinal axis. Either or both these parties had the right, under their respective leases, to take out all the coal down to this line. The coal company was the common lessor of both parties, and, hence, the rules governing adjacent mines when owned by different owners, cannot apply to the company plaintiff, for having the power so to do, if it neglected to protect itself by covenant, it cannot plead rules, resulting *ex necessitate rei*, as against its own grant. It follows that if both parties, in strict accordance with the terms of their several leases, had worked down to the synclinal axis, they would have brought the two mines together, and so produced every result now complained of, except such as may have arisen from the criminal negligence of one or both of the lessees. The company, therefore, has no right to complain of the mere conjunction of these workings, for this is but the result of its own grant; and it follows, that unless it can show some wrong done in the *manner* in which Freck conducted his workings, it has no standing to maintain this suit. Now as there is no question as to the character of Freck's work, so far as his own lease extended, our inquiry must be limited to a single point, to wit: was the damage complained of the result of Freck's *wilful* trespass upon the adjacent lease? His southern boundary, the synclinal axis, could, by no human possibility, be ascertained until developed by the proper workings. Yet Freck had the right, under his lease, to go to that line, and this necessarily involved the further right of ascertaining this line, by the best means in his power. It is here that the court below committed an error, in treating the case as one between distinct landowners; in such case the doctrine that the lessee must ascertain the dividing line at his peril, would·be correct, and though he passed over it with the best possible intentions, he would nevertheless be a trespasser. Not so, when the lessor, not only gives his tenant the power, but makes it his duty, to explore and mark a theoretical line upon his own premises. In such case the tenant cannot be treated as a trespasser if, in an honest attempt to ascertain that line, he should chance to pass over it; for the right to do what is necessary in order to find and fix that line is implied in the grant by which it is made a boundary. ·Freck had a right to ascertain his southern line, and if he did no more than was necessary for this purpose he was not a trespasser. The difficulties, in the accomplishment of this result, become apparent by a glance at the map before us, on which we observe the plottings for the synclinal axis in no less than five different places. It is thus apparent that the true line, the one finally adopted, was only conclusively set-

tled after Freck's workings had enabled the engineers to ascertain its true location.

But there was not a day, not an hour, during the progress of this work, when this company had not the power to put an end to these operations, on the discovery that the lessee was working beyond the bounds of his lease.

In that lease it had retained full supervisory powers; the work was done under the constant inspection of its own engineer, and in case of dispute it had the power to settle all matters by arbitration. And if, under such circumstances, being fully and accurately informed of Freck's operations, it chose to stand by and permit him to prosecute his researches, according to the best of his judgment, at the same time receiving the products of his labor as so much rent under the lease, by what rule of justice can it now treat him as a trespasser? If we examine the notice of Mr. Stockett, the plaintiff's engineer, dated April 21st 1871, when Freck's gangway had already been driven south of what afterwards proved to be the true synclinal axis, we find two things worthy of observation. 1. He is notified not that his gangway, but " a part of the breasts turned on the south side of your east gangway of the second lift on the Mammoth Vein, is beyond the limits of your lease." 2. That " the object of the notice is to prevent any infringement on the rights granted to the lessees." Thus we observe that, even as yet, the true position of the dividing line was not discovered, and that the defendant's workings were not regarded as likely to prove injurious to the rights of the company, and he was warned only to avoid interference with the lease of the adjoining tenants. Then we have Mr. Stockett's letter of the same date to the president of the company, detailing the conversation he had had with Freck and his mining-boss, Williams; the confidence they expressed that there was yet another south dip between the breasts referred to, and the adjacent lease of Gorrell & Co., and his own opinion that whilst this was possible it was not probable. Thus the company, by its own officer, was put into possession of every detail, not only of Freck's doings, but of his intentions and opinions, and if it trusted him, without remonstrance or caution, to proceed with his experiments in good faith, we cannot see why it should complain of the result.

Again, the defendant ought not to be held liable for damage resulting from the neglect of either the plaintiff or Gorrell & Co. It is manifest, from the facts of this case, as well as of the case of this same plaintiff against the last-named company, as reported in the Leg. Int. of 29th March 1872, that much, if not all, of the damage to the Centralia mines resulted from the intentional acts of the lessees of Hazeldell, in so sloping their gangway as to throw the water into the Freck workings. But the plaintiff had the same powers over Gorrell & Co. that it had over Freck & Blackiston,

[Freck *v.* Locust Mountain Coal and Iron Co.]

and if it passively permitted the former to do that which proved disastrous to its own property, it cannot cast the burden of its own negligence over upon the defendant.    We see, from the case above stated, that when it chose to move, there was no want of powers, and that it could then make itself felt to some purpose, not only through the reserved powers of the lease, but also through the strong arm of this court.

Without dwelling upon any of the numerous exceptions, we but suggest, by way of summary, the following principles for the re-trial of this case.

If the crossing of the line of the two leases, by Freck, resulted from an error in judgment in an honest attempt to develop that line—if the company permitted him to exercise his own judgment concerning this matter, by passively or actively acquiescing in what he did, or if the damage resulted from the direct acts of the lessees of the north dip—the defendant is not responsible for the consequences flowing from any or all of such acts.    In such case the plaintiff ought only to recover the difference in the price of the coal which the defendant took from the north dip, and that which came from his own workings, as measured by the prices fixed in the two leases—we believe some ten cents per ton.

Furthermore; it will be proper for the court below to admit all such testimony as may bear upon the manner and character of the defendant's work in the mines, and theory and intent governing it.

> The judgment is reversed, and a *venire facias de novo* is awarded.